# Exhibit 1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - x
     TAKEDA PHARMACEUTICAL CO., LTD.,
5
     TAKEDA PHARMACEUTICALS NORTH
6
     AMERICA, INC., TAKEDA
7
     PHARMACEUTICALS LLC, AND TAKEDA
8
     PHARMACEUTICALS AMERICA, INC.
9
                 Plaintiffs
10
                           Case No:
11
     V.                    3:11-CV-00840-JCS
12
     HANDA PHARMACEUTICALS, LLC
13
                 Defendant
14   - - - - - - - - - - - - - - - x

15         VIDEOTAPED DEPOSITION OF

16          ALLAN MYERSON, PH.D.

17        Tuesday, November 15, 2011

18              9:41 a.m.

19

20          Finnegan Henderson

21          55 Cambridge Parkway

22          Boston, Massachusetts

23

24          Deborah Roth, RPR/CSR

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4      - - - - - - - - - - - - - - - x

       TAKEDA PHARMACEUTICAL CO., LTD.,

5

       TAKEDA PHARMACEUTICALS NORTH

6

       AMERICA, INC., TAKEDA

7

       PHARMACEUTICALS LLC, AND TAKEDA

8

       PHARMACEUTICALS AMERICA, INC.

9

                    Plaintiffs

10

                             Case No:

11

       V.                    3:11-CV-01609-JCS

12

       ANCHEN PHARMACEUTICALS, INC.

13

       AND TWI PHARMACEUTICALS, INC.

14

                    Defendants

15     - - - - - - - - - - - - - - - x

16             VIDEOTAPED DEPOSITION OF

17             ALLAN MYERSON, PH.D.

18           Tuesday, November 15, 2011

19                   9:41 a.m.

20

                Finnegan Henderson

21

               55 Cambridge Parkway

22

              Boston, Massachusetts

23

24           Deborah Roth, RPR/CSR

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - x

     TAKEDA PHARMACEUTICAL CO., LTD.,

5

     TAKEDA PHARMACEUTICALS NORTH

6

     AMERICA, INC., TAKEDA

7

     PHARMACEUTICALS LLC, AND TAKEDA

8

     PHARMACEUTICALS AMERICA, INC.

9

                 Plaintiffs

10

                              Case No.:

11

     V.                       3:11-cv-01610-CRB

12

     IMPAX LABORATORIES, INC.

13

                 Defendant

14   - - - - - - - - - - - - - - - x

15           VIDEOTAPED DEPOSITION OF

16           ALLAN MYERSON, PH.D.

17         Tuesday, November 15, 2011

18                9:41 a.m.

19

             Finnegan Henderson

20

           55 Cambridge Parkway

21

           Boston, Massachusetts

22

23

             Deborah Roth, RPR/CSR

1    PRESENT:

2

3    FOR THE PLAINTIFFS AND DEPONENT:

4    HEATHER E. TAKAHASHI, ESQ.

5    TED G. DANE, ESQ.

6    MUNGER TOLLES & OLSON LLP

7    335 South Grand Avenue, 35th Floor

8    Los Angeles, California  90071

9    213 683 9100

10   heather.takahashi@mto.com

11   ted.dane@mto.com

12

13   FOR THE DEFENDANT IMPAX LABORATORIES, INC.:

14   ERIC M. ACKER, ESQ.

15   MORRISON & FOERSTER

16   12531 High Bluff Drive, Suite 100

17   San Diego, California  92130

18   858 720 5109

19   eacker@mofo.com

20

21

22

23

24

```
1    PRESENT:

2

3    FOR THE DEFENDANTS ANCHEN PHARMACEUTICALS,

4    INC., AND TWI PHARMACEUTICALS, INC.:

5    DON J. MIZERK, ESQ.

6    HUSCH BLACKWELL

7    120 South Riverside Plaza, Suite 2200

8    Chicago, Illinois  60606

9    312 526 1546

10   don.mizerk@huschblackwell.com

11

12   FOR THE DEFENDANT HANDA PHARMACEUTICALS, LLC:

13   PAYSON LeMEILLEUR, ESQ.

14   KNOBBE MARTENS

15   2040 Main Street, 14th Floor

16   Irvine, California  92614

17   949 760 0404

18   plemeilleur@kmob.com

19

20   ALSO PRESENT:  Jody Urbati, Videographer

21

22

23

24
```

1    INDEX

2    WITNESS:  ALLAN MYERSON, PH.D.

3    EXAMINATION             PAGE

4    By Mr. Acker            10

5    By Mr. LeMeilleur       130

6    By Mr. Mizerk           186

7

8    EXHIBITS                                PAGE

9    EX 12  Declaration of Allan Myerson in

10          Support of Takeda's Opening Claim

11          Construction Brief and Exhibits      11

12   EX 13  "Determination of Purity by

13          Differential Scanning Calorimetry"

14          (DEX0014495 - 0014498)               75

15   EX 14  "Introduction of Differential

16          Scanning Calorimetry in a General

17          Chemistry Laboratory Course:

18          Determination of Thermal Properties

19          of Organic Hydrocarbons"

20          (DEX0014506 - 0014508)               83

21   EX 15  "Solid State Chemistry of Drugs,

22          Second Edition"

23          (IPXL-0009816 - 0009825)             85

24

| | EXHIBITS | PAGE |
|---|---|---|
| 1 | | |
| 2 | EX 16 Plaintiffs' Responses to Anchen | |
| 3 | Pharmaceuticals, Inc.'s First | |
| 4 | Set of Interrogatories | 114 |
| 5 | EX 17 "Executive Summary of TAK-390 | |
| 6 | Solid State Chemistry" | |
| 7 | (DEX0014361 - 0014379) | 114 |
| 8 | EX 18 "Comprehensive Dictionary of | |
| 9 | Physical Chemistry" | |
| 10 | (DEX0003648 - 0003649) | 143 |
| 11 | EX 19 U.S. Patent 5,128,356 | 147 |
| 12 | EX 20 International Patent Application | |
| 13 | WO 9602535A1 | |
| 14 | (IPXL-0009053 - 0009121) | 152 |
| 15 | EX 21 "Remarks" | |
| 16 | (DEX0001945 - 0001951) | 159 |
| 17 | EX 22 International Patent Application | |
| 18 | WO 97/02261 | |
| 19 | (IPXL-0009153 - 0009182) | 162 |
| 20 | EX 23 Joint Claim Construction and | |
| 21 | Prehearing Statement | 166 |
| 22 | EX 24 Document | |
| 23 | (DEX0001956 and 0001957) | 173 |
| 24 | | |

```
 1   EXHIBITS                                    PAGE

 2   EX 25  "Solid State Chemistry of Drugs,

 3          Second Edition"

 4          (IPXL-0009876 - 0009893)             228

 5   EX 26  "McGraw-Hill Dictionary of

 6          Scientific and Technical

 7          Terms, Third Edition"

 8          (IPXL-0009914 - 0009918)             229

 9   EX 27  "Hawley's Condensed Chemical

10          Dictionary, 12th Edition"

11          (IPXL-0010283 - 0010286)             231

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2              THE VIDEOGRAPHER:  This is the video

 3    operator speaking, Jodi Urbati, of Merrill

 4    Legal Solutions, 225 Varick Street, New York,

 5    New York 10014.

 6              Today is November 15th, 2011.  The

 7    time is 9:41 a.m.

 8              We are at the offices of Finnegan

 9    Henderson, Cambridge, Massachusetts, to take

10    the videotaped deposition of Allan Myerson in

11    the matter of Takeda Pharmaceutical Company,

12    LTD, versus Handa Pharmaceuticals, LLC; Anchen

13    Pharmaceuticals, Inc., and TWI Pharmaceuticals,

14    Inc.; and Impax Laboratories, Inc., in the

15    United States District Court, Northern

16    District of California, San Francisco

17    Division.

18              Will counsel please introduce

19    themselves for the record, and then the

20    reporter, Deborah Roth, of Merrill Legal

21    Solutions will swear in the witness.

22              MR. ACKER:  Eric Acker of Morrison &

23    Foerster on behalf of Impax Laboratories.

24              MS. TAKAHASHI:  Heather Takahashi of
```

1    Munger Tolles & Olson on behalf of the Takeda

2    parties and the witness, Dr. Myerson.

3              MR. DANE:  Ted Dane also Munger

4    Tolles & Olson.

5              MR. LeMEILLEUR:  Payson LeMeilleur

6    of Knobbe Martens on behalf of the defendant,

7    Handa Pharmaceuticals.

8              MR. MIZERK:  Don Mizerk of Husch

9    Blackwell on behalf of TWI Pharmaceuticals and

10   Anchen Pharmaceuticals.

11              ALLAN MYERSON, Ph.D.,

12   having been satisfactorily identified by the

13   production of his Massachusetts driver's

14   license, and duly sworn by the Notary Public,

15   was examined and testified as follows:

16              EXAMINATION

17   BY MR. ACKER:

18   Q.  Good morning, Doctor.

19   A.  Good morning.

20   Q.  As I just indicated, my name is Eric

21   Acker and I represent Impax Laboratories.  I

22   appreciate you taking time this morning to

23   answer some of ours questions.

24              You've had your deposition taken

1          So, normally, while you expect the

2     major peaks to be the major peaks on occasion

3     -- well, quite frequently, relative intensity

4     will change.  So it's usually not used as a --

5     nearly as much as peak location in determining

6     whether a form is present or not.

7          Certainly, the larger intensity

8     peaks should still be the larger intensity

9     peaks, but the order sometimes will change;

10    particularly, due to preferred orientation

11    effects.

12       Q.  And is that the full extent of the

13    experimental error that you believe one of

14    skill in the art would expected to see in 1999

15    or 2000 in an XRPD experiment that is up to

16    plus or minus .2 degrees?

17       A.  Plus or minus .2 degrees two theta.

18    That's correct.

19       Q.  And this experimental error in the

20    two theta values, after you did the analysis

21    would result in a corresponding error in the

22    d-values, correct?  d-spacings?

23       A.  Yes.  It would not be a linear.

24          It's not linear because we have to

1    solve Bragg's law; and, of course, what you

2    would see is that you would have a bigger

3    variation in the d-spacings at low angles than

4    you would at high angles because that's just

5    how the calculation would work.

6        Q.  And the result of .2 degrees in the two

7    theta angles or two theta degrees would result

8    in a larger error in the spacings, correct?

9        A.  No.  Actually, that's not correct.

10       Q.  In the d-spacings?

11       A.  No, it would not.

12       Q.  As a numerical value, it would result

13   in a larger error in the d-spacings?

14       A.  No.  That's incorrect.

15            As I just testified, the change in

16   the d-spacings would be a function of the

17   angle.  You would have a larger than .2 error

18   in the -- in the low angles, which are the

19   high d-spacings, and a much smaller than .2

20   error in the higher angles, which are the --

21   which are the smaller d-spacings.

22       Q.  But the way that you would determine

23   what the error in the d-spacings were based on

24   some error in the two theta angles would be to

 1    do the analysis under Bragg's law?

 2        A.  Exactly right.  You would calculate the

 3    delta d for each angle by substituting in the

 4    Bragg's law equation, right, you'd say that

 5    Bragg's law is n lambda equals 2d sin theta,

 6    right?

 7            So you would just substitute -- you

 8    would get a difference of sin theta plus .1

 9    and sin theta minus .1.  You know, you could

10    just make an equation, delta d, have two

11    things.  It would be very simple to do.  It's

12    done all the time.

13        Q.  So is it your opinion that one of skill

14    in the art in 1999 or 2000, when running an

15    XRPD experiment multiple times on the same

16    crystal, would expect to see up to a .2 degree

17    scientific error in the two theta results?

18        A.  Yes.

19        Q.  And would it also be your opinion that

20    one in nineteen ninety -- or 2000, if one were

21    to run multiple XRPD analysis on different

22    crystals of the same type, they would see the

23    same level of scientific error?

24        A.  Well, I'm sorry.  What do you mean by

1    A.  Yes.

2    Q.  Claim 1 of the '058 requires specific

3    characteristic peaks of interplanar spacings

4    or d-values as calculated Bragg's law for the

5    claimed compound, correct?

6    A.  It requires a specific set of

7    d-spacings for the same compound.  That's

8    correct.

9    Q.  And what is set out in the claim are 11

10   specific characteristic peaks measured out to

11   the hundreds decimal point, right?

12   A.  Two decimal places, correct.

13   Q.  And there's no mention in the claim of

14   experimental error, right?

15   A.  That's correct.

16   Q.  No use of the word "about," right?

17   A.  That's correct.

18   Q.  No use of the word "approximately"?

19   A.  That's correct.

20   Q.  No other qualifying language of any

21   sort in the claim, right?

22   A.  That's correct.

23   Q.  Just 11 measurements of interplanar

24   spacings or d-values measured out two decimal

1    points, right?

2        A.  That's correct.

3        Q.  And that's -- the same is true for

4    claim 2, correct?

5        A.  That's correct.

6        Q.  Again, there's no mention, no

7    qualifying language such as "about" or

8    "approximately" in claim 2, correct?

9        A.  That's correct.

10       Q.  And there's no mention of experimental

11   error in claim 2, correct?

12       A.  That's correct.

13       Q.  Again, just 11 d-spacing measurements

14   measured out to two decimal points, right?

15       A.  That's correct.

16       Q.  And you agree that the written

17   description of the patent plays the key role

18   in determining what one of skill in the art

19   would believe that a claim term meant?

20       A.  You mean the specification?

21       Q.  I'm talking about the claims and the

22   specifications?

23       A.  Right.  The patent itself?

24       Q.  Yes.

1    A.  Right.  I agree with that.

2    Q.  And would you agree with me that the

3  claims are the most important thing to review

4  in determining what is the meets and bounds of

5  an invention?

6    A.  Well, the claim, certainly, is the most

7  important thing, but you interpret the claim

8  in light of the specification.

9    Q.  And then next in line would be looking

10  at the specification; that is, the written

11  narrative in the patent, published patent,

12  before the claims, right?

13    A.  Correct.

14    Q.  And then you also might look at the

15  prosecution history to determine what claim

16  terms may mean, right?

17    A.  That's possible, yes.

18    Q.  And that is all -- you understand

19  that's all as what is referred to as intrinsic

20  evidence; that is, the claims, the

21  specification, and the file history?

22         You understand that?

23    A.  Yes.

24    Q.  And you also understand that what you

1   have done in this case with respect to this

2   term is you have looked to extrinsic evidence

3   to determine what you believe the claim term

4   to mean, right?

5       A.  Yes.

6       Q.  And extrinsic evidence, that is

7   evidence that's not in the claims, right?

8       A.  Correct.

9       Q.  And it's evidence that's not in the

10  specification, correct?

11      A.  Correct.

12      Q.  And it's evidence that's not in the

13  file history, right?

14      A.  Not that I recall.

15      Q.  And you would agree that in addition to

16  there being no mention of experimental error

17  anywhere in the claims, there's no mention

18  anywhere in the specification of experimental

19  error, right?

20      A.  That's correct.

21      Q.  You would also agree with me that there

22  is no mention in the file history for the '058

23  patent that one of skill in the art should

24  account for experimental error in the

1    d-spacing measurements, correct?

2      A.  I don't, as I sit here, recall what it

3    says in the file history on that particular

4    subject, but I don't recall such a -- any

5    statement, but I can't recall.

6      Q.  Okay.  Just so we're clear, you would

7    agree that there's nothing in the claims or

8    nothing in the specification about

9    experimental error, right?

10     A.  That's correct.

11     Q.  And you have no recollection of

12   anything in the file history about

13   experimental error, correct?

14     A.  That's correct.

15     Q.  And your opinion that experimental

16   error should be accounted for in defining the

17   claim term is based solely on extrinsic

18   evidence, right?

19          MS. TAKAHASHI:  Objection.

20   Mischaracterizes the witness' testimony.

21     A.  On intrinsic evidence and my own

22   knowledge and experience.

23     Q.  Okay.  And intrinsic evidence is

24   documents that you've cited in your

1    declaration, correct?

2        A.  Yes.

3        Q.  And your own experience would also be

4    extrinsic evidence, correct?

5        A.  Yes.

6        Q.  So there's nothing anywhere in the

7    extrinsic -- intrinsic evidence for the '058

8    patent that would lead one of skill in the art

9    in 1999 or 2000 to believe that they should

10   count for some experimental error in the

11   d-spacing values, right?

12       A.  Again, my opinion, one of ordinary

13   skill would understand that d-spacing values

14   are not accurate to two decimal places and

15   would understand that there's error in there,

16   but I guess you would call that extrinsic

17   evidence, as well.

18       Q.  It's -- actually, the Federal Circuit

19   has, not me, but let me ask the question

20   again.

21           There's nothing in the intrinsic

22   records, the claims, the specification of the

23   file history that tells one of skill in the

24   art in 1999 or 2000 that they should account

1    for experimental error in the d-spacing values

2    listed in claims 1 and 2 of the '058 patent?

3        A.  There's nothing in the patent

4    specification or the claims.  I agree with

5    that.

6        Q.  Okay.  Let's look at the data that's

7    actually in the '058 patent, if we could.

8              If we start -- if we look at

9    column 7 and you -- column 7, lines 15 to 18,

10   you see there, there's a reference there to

11   the actual machine, the XRPD machine that was

12   used --

13       A.  Yes.

14       Q.  -- to do the analysis?

15       A.  Yes.

16       Q.  And it reads, "X-Ray powder diffraction

17   was determined using the x-ray powder

18   diffraction meter Rigaku RINT2500 (ultraX18)

19   No. PX-3."

20              Do you see that?

21       A.  Yes.

22       Q.  And that's just a reference to the XRPD

23   machine that was used, correct?

24       A.  That's correct.

1    columns -- column 10, lines 16 and 17.

2         A.  There are actually d-spacings reported

3    in two places in this example --

4         Q.  Okay.

5         A.  -- starting on column 9, line 1, which

6    is for the wet crystal.  There are 4 d-spacings

7    -- 5 d-spacings reported.

8              And then later on, there's a further

9    processing, and then there's another sort of

10   d-spacings reported, which are the ones that

11   you just mentioned.

12        Q.  And that's in column 10, lines --

13        A.  I'm sorry.

14             Actually, continuing, there's

15   additional d-spacings in column 9, line 20;

16   and in column 9, line 58; followed by the

17   d-spacings in column 10, lines 14 and 15.

18        Q.  And do you understand that the

19   d-spacings in column 10, lines 16 and 17 are

20   the d-spacings of the final product, the final

21   crystal?

22        A.    Those are the d-spacings reported in

23   the claim, yes.

24        Q.  So what it reads is, at column 10,

1    lines 14 to 17, "The crystal yielded a powder

2    x-ray diffraction pattern with characteristic

3    peaks appearing at powder x-ray diffraction

4    interplanar spacings d of 11.68, 6.77, 5.84,

5    5.73, 4.43, 4.09, 3.94, 3.89, 3.69, 3.41, and

6    3.11 Ångstrom"; is that right?

7         A.  That's correct.

8         Q.  And those are the exact d-spacings that

9    are claimed in claim 1 of the '058 patent,

10   right?

11        A.  Yes, they are.

12        Q.  There's no variation whatsoever between

13   the d-spacings in reference example 4 and the

14   claim -- claim 1 of the '058, right?

15        A.  I would add there's no difference in

16   the d-spacings in reference example 4 shown in

17   lines 16 and 17 with the claims.

18             However, the d-spacings shown

19   previously are -- have differences.

20        Q.  And you understand that the earlier

21   d-spacings are XRPD analysis of products of

22   the experiment before you get to the final

23   crystal that's reported in column 10 at

24   lines 15 through 18?

1          MS. TAKAHASHI:  Objection.  Vague.

2      A.  (Witness reviewing document.)

3          The x-ray diffraction peaks reported

4  prior to the final ones reported in there are

5  for the title compound in less pure versions

6  because what they're doing is recrystallizing

7  it multiple times to get to a final purity and

8  then doing a final x-ray diffraction.

9          So it actually is the correct

10  compound, and it is -- does contain,

11  apparently, at least a portion of the correct

12  crystalline form, but it's not the final

13  product.

14      Q.  And in the final product are the

15  d-spacings that we read a minute ago that are

16  the exact same d-spacings to two decimal

17  points as in the claim 1 of the '058, right?

18      A.  That's correct.

19      Q.  There's no variation whatsoever?

20      A.  That's correct.  They're the same.

21      Q.  And if you go to example 1, beginning

22  on column 10 and going to column 11, again,

23  that's a preparation of crystal

24  (R)-lansoprazole; and, again, no d-values are

1    the two decimal points, the results for the

2    two theta values or the d-spacing values are

3    identical, it's true that there is no

4    experimental error between the XRPD analysis

5    in reference example 4 and in example 2 of the

6    '058, correct?

7        A.  No.  That's actually an incorrect

8    statement.

9        Q.  Well, can you point to any specific

10    d-value and say that there is a different

11    d-value obtained because of experimental

12    error?

13        A.  No, but that's not the question you

14    asked.

15            The question you asked was that

16    there was no experimental error, which is

17    incorrect, okay.

18        Q.  Well, let's back up.

19            We have two experiments to prepare

20    crystalline hydrate (R)-lansoprazole:  one in

21    reference 4 and one in example 2 --

22        A.  Correct.

23        Q.  -- of the '058, correct?

24        A.  Correct.

1      Q.  Different methods -- we can agree that

2   different methods were used to prepare the

3   crystal in reference example 4 and the crystal

4   in example 2, correct?

5      A.  Correct.

6      Q.  Once the experiment was completed and

7   there was crystalline hydrate (R)-lansoprazole

8   in each of those experiments, XRPD analysis

9   was done on each of the two crystals, right?

10      A.  Correct.

11      Q.  And the d-values obtained, the 11

12   d-values obtained for those crystals were

13   identical to two decimal points, correct?

14      A.  That's correct.  Identical to two

15   decimal places when you round the second set

16   to two decimal places, correct.

17      Q.  And they not only were identical to one

18   another to two decimal points, they were also

19   identical to the d-spacings that are set forth

20   in claim 1 of the '058, right?

21      A.  Right.  But, obviously, the claim is

22   not an experiment.  It's a claim.

23      Q.  So one of skill in the art in 1999 or

24   2000, in looking at this data, would see that

1  there were two methods used to prepare

2  crystalline hydrate (R)-lansoprazole:  one in

3  reference example 4 and one in example 2, and

4  the exact same d-values to two decimal points

5  were obtained that matched exactly to the

6  d-values in claim 1 of the '058, right?

7      A.  That's correct.

8      Q.  So given that data, in your opinion, is

9  there anywhere in the data of the '058 patent

10  that would cause one of skill in the art to

11  believe that they should add experimental

12  error into the definition for claim 1 of the

13  '058 patent?

14      A.  Nothing in the data.  It would be based

15  on the knowledge and experience of one of

16  ordinary skill who understands x-ray

17  diffraction analysis.

18      Q.  So, again, extrinsic evidence to the

19  '058 specification and its claims, correct?

20      A.  Correct.

21          MR. ACKER:  Why don't we take five

22  minutes.

23          THE VIDEOGRAPHER:  Off the record,

24  10:26 a.m.

1     Q.  So let me try again.

2          In your opinion, the phrase

3     "'melting start temperature' means 'the

4     temperature at which crystals start to melt,

5     represented by the onset temperature of

6     melting as measured by DSC.'"

7          And that is your opinion, correct?

8     A.  Correct.

9     Q.  And when you talk about the term

10    "melting start temperature," you're talking

11    about the term in the claims 9 and 10 of the

12    '668 patent, correct?  And if you need to take

13    a look --

14          MS. TAKAHASHI:  It's tab 4.

15    Q.  -- tab 4 of your --

16    A.  I'm sorry.  What claim numbers?

17    Q.  Claims 9 and 10.

18    A.  That's correct.

19    Q.  And can you point to a single

20    scientific paper, article, or other reference

21    other than the '688 patent that uses or

22    defines the term "melting start temperature"?

23          MS. TAKAHASHI:  Objection.

24    Ambiguous.

1      A.  I believe I provided this in some of

2   the extrinsic evidence attached in here.

3           The -- it's quite a common use,

4   "melting start temperature."

5      Q.  Those words, "melting start

6   temperature"?

7      A.  Oh, I don't know if -- the concept.

8   I'm not sure if they say exactly the same

9   words.

10     Q.  So let me ask you again.

11          Are you -- can you point to a

12  single scientific paper, article, or other

13  reference other than the '668 patent that uses

14  the specific term "melting start temperature"?

15          MS. TAKAHASHI:  Objection.  Asked

16  and answered.

17     A.  Yeah.  Again, I would have to look at

18  the extrinsic evidence I cite in support of

19  this to see what exact language they use.

20          In my opinion, if they don't use

21  that exact language, they use synonymous

22  language that, in my opinion, means the same

23  thing.

24     Q.  Okay.  Let's take a look at

1    A.  Yeah.  I would, actually, just for

2    completeness, finish the sentence that says

3    "except as defined otherwise."

4    Q.  Okay.  But is there anywhere in this

5    section 741, can we find the term "melting

6    start temperature"?

7    A.  There is -- the -- it doesn't say

8    "melting start temperature."  It says defined

9    -- excuse me.

10           There's a quote that I have in

11   paragraph 73 from here which says, "The

12   temperature at which the column of the

13   substance under test is observed to collapse

14   definitely against the side of the tube at any

15   point as defined as the beginning of melting";

16   and, to me, "beginning" and "start" mean the

17   same thing.

18           So I consider that to be evidence

19   for "melting start temperature."

20   Q.  Okay.  And let's go back to the USP.

21           And that quote is actually the last

22   full paragraph in the column under 741, and it

23   reads, "The temperature at which the column of

24   the substance under test is observed to

1    collapse definitively [sic] against the side

2    of the tube at any point is defined as the

3    beginning of melting, and the temperature at

4    which the test substance becomes liquid

5    throughout is defined as the end of melting or

6    the 'melting point.'"

7              MS. TAKAHASHI:  Objection.

8    Misstates document.

9        Q.  Did I read that correctly?

10       A.  I'm sorry.  I wasn't actually looking

11   at the document while you were reading.

12   Where --

13       Q.  If you go to column -- the 741, melting

14   range, starting temperature, if you go down to

15   the last full paragraph.

16             MR. ACKER:  I think he wants you to

17   help him out there.

18             MS. TAKAHASHI:  Right here.

19   (Indicating.)

20             THE WITNESS:  Okay.

21       A.  Right.  And the final sentence says,

22   "The two temperatures fall within the limits

23   of the melting range."

24       Q.  But in that sentence that we just read,

1    there's no mention of the term -- or the term

2    "melting start temperature" is not there?

3        A.  The exact words "melting start

4    temperature" are not there.  But, again, I

5    would say "beginning" and "start" are

6    synonymous.

7            So I consider beginning of melting

8    to be a synonym of "melting start."

9        Q.  And the method that is described as

10   being used there is not DSC, right?

11       A.  In this particular example, that's

12   correct.  It's not DSC.

13       Q.  In fact, nowhere in this section of the

14   USP, section 741, is there a description of

15   using DSC to measure melting start

16   temperature, right?

17       A.  Not in --

18           MS. TAKAHASHI:  Objection.

19   Ambiguous.

20       A.  Not in this document, that's correct.

21   This is not talking about DSC.

22       Q.  So the first document you referenced,

23   the 1995 USP, section 741, Melting Range or

24   Temperature, we can agree that there is

1    nowhere in that section the term "melting

2    start temperature," right?

3              MS. TAKAHASHI:  Objection.  Asked

4    and answered.

5        A.  Well, as I've previously said, the

6    words "melting start temperature" don't

7    appear, but the synonymous words "beginning of

8    melting" appear.

9        Q.  And nowhere in that section is there a

10   reference to using DSC to measure melting

11   start temperature, correct?

12             MS. TAKAHASHI:  Objection.  Asked

13   and answered.

14       A.  Again, DSC does not appear in this

15   document.

16       Q.  And if we go back to that section that

17   we just looked at, it's really talking about a

18   range between the beginning of melting and the

19   end of melting, right?

20       A.  That's correct.  All melting points are

21   reported as a range.

22       Q.  So it's your opinion that all melting

23   points are reported in range form?

24       A.  They should be because no method of --

1    no method of measurement of melting doesn't

2    measure a range.

3      Q.  And what this section is talking

4    about -- what technique is this section

5    talking about to determine the beginning of

6    melting?

7      A.  This is a -- this is a capillary

8    method.  This is something I used to use when

9    I was a student.  This is the old method they

10    used to use, put a capillary tube in an oil

11    bath and observe visually.

12      Q.  So you put your substance in a

13    capillary tube and actually heat it in oil

14    bath; is that right?

15      A.  That's correct.

16      Q.  And then you observe the substance

17    while it's being heated, correct?

18      A.  Right.

19      Q.  And when -- according to the USP, when

20    the substance is observed to collapse

21    definitively [sic] against the side of the

22    tube, that point is defined as the beginning

23    of the melting, correct?

24          MS. TAKAHASHI:  Objection.

1    Misstates the document.

2        A.  Yeah.  The document -- actually, the

3    document says that, yeah, when "...the column

4    of the substance under test is observed to

5    collapse definitely against the side of the

6    tube at any point is defined as the beginning

7    of melting."

8             And if you do these experiments,

9    actually, and you watch, I mean, your goal is

10   to see the beginning, which is what they

11   describe here; and when something is fully

12   melted, you know it's melted because you see a

13   meniscus because it's become liquid.

14             It's a very tedious experiment to

15   do, and I'm glad that I don't have to do them

16   anymore.

17       Q.  But the document you're relying on to

18   help define the term "melting start

19   temperature" talks about using this capillary

20   method and actually observing this -- what is

21   the term called the "beginning of melting" and

22   the "end of melting," right?

23             MS. TAKAHASHI:  Objection.

24   Misstates the witness' testimony.

1    A.  The document is using the capillary

2    method, and it defines the "beginning of

3    melting," which is the term that we're looking

4    to define, the "melting start temperature,"

5    which I believe is synonymous; and, in fact,

6    no matter what device is used, the beginning

7    of melting is still the beginning of melting.

8    Q.  But, again, we can agree that the term

9    "melting start temperature" is nowhere in this

10   document, and the use of DSC is nowhere in

11   this document?

12            MS. TAKAHASHI:  Objection.

13   Compound.  Asked and answered.

14   A.  Yes.  Well, as I've previously

15   answered, the term -- the words "melting start

16   temperature" are not there, but "beginning of

17   melting" are, which is a synonym, and DSC is

18   not mentioned.  That's correct.

19   Q.  So let's look at the next document that

20   you cite, which is the USP for 2005,

21   Exhibit 23.

22            Now, this document, the USP for

23   2005, would not have been available to one of

24   skill in the art to review in 1999 or 2000,

1    Q.  There is a reference in this section to

2    the use of DSC, correct?

3    A.  Correct.

4    Q.  But as with the other section of the

5    USP from 2005, one of skill in the art would

6    not have had access to this document in 1999

7    or 2000, right?

8    A.  This document, that's correct.

9    Q.  And in this section, section 891,

10    there's no mention of a melting start

11    temperature anywhere, right?

12        MS. TAKAHASHI:  Objection.

13    Ambiguous.

14    A.  Again, this says, "In the case of

15    melting, both an 'onset' and a 'peak'

16    temperature can be determined objectively..."

17        "Onset" and "melting start" are the

18    same thing.  They're synonymous.

19    Q.  And you base your opinion that "onset"

20    and "melting start temperature" are the same

21    thing based on anything other than your

22    opinion?

23    A.  My knowledge of the English language,

24    and that's my opinion.

1      That's -- I mean, synonyms are
2  synonyms.  "Start"; "beginning"; and "onset"
3  all mean the same thing.
4      Q.  But can you point to any other
5  reference other than your interpretation of
6  the English language to equate the word
7  "onset" with the term "melting start
8  temperature"?
9      A.  I imagine if you looked in Roget's
10  Thesaurus, which I didn't do, you might find
11  that these things are considered to be
12  synonyms, the words -- the initial words
13  "beginning"; "onset"; and "start," though not
14  necessarily connected to the word "melting
15  point."
16      Q.  So let's look at the reference under
17  "Transition Temperature."
18          If you go to the sentence that
19  begins "In the case of melting," do you have
20  that sentence?
21      A.  Where -- I'm sorry.  Where are we
22  looking?
23          Oh, I see.  Yeah.  Okay.
24      Q.  Do you have that sentence?

1      A.  Yes.

2      Q.  And it reads, "In the case of melting,

3   both an 'onset' and a 'peak' temperature can

4   be determined objectively and reproducibly,

5   often to within a few tenths of a degree."

6           And we can agree that the words

7   "melting start temperature" aren't in that

8   sentence, correct?

9      A.  Again, my answer is the same, that the

10   term "onset" is the synonym for the "start

11   temperature," and it's exactly describing the

12   melting onset and the peak.

13      Q.  And then it continues, "While these

14   temperatures are useful for characterizing

15   substances," and these temperatures are -- and

16   "these temperatures are useful for

17   characterizing substances, and the difference

18   between the two temperatures is indicative of

19   purity, the values cannot be correlated with

20   subjective, visual 'melting-range' values..."

21           Do you see that?

22      A.  Yes, I do.

23      Q.  And what do you understand that to

24   mean, that those temperatures "cannot be

1    correlated with subjective, visual

2    'melting-range' values"?

3        A.  It says what it means.

4            The fact is that when you do melting

5    range values with your eye, your eye is pretty

6    good, but it's not as accurate as automated

7    methods.  So you can't necessarily correlate

8    your data from a DSC with any visual data.

9            It's -- my analogy might be if you

10   tried to visually pick peaks on a graph and

11   try to correlate that with what peak picking

12   software that used statistical analysis will

13   give you, you get different results because

14   people's eyes fool them; and so that's why --

15   that's why they call it subjective.

16       Q.  And what they're talking about there,

17   or one of the techniques they're talking about

18   there, is the capillary method that you

19   described that was set out in the 1995 USP,

20   correct?

21           MS. TAKAHASHI:  Objection.

22   Ambiguous.

23       A.  That's correct.

24       Q.  And so what the USP in 2005 is saying,

1    MR. ACKER:  Do you want to testify

2  for him, or do you want to let him answer?

3    MS. TAKAHASHI:  I object to the form

4  of the question.

5    A.  I'm sorry.  Could I hear the question

6  again?

7    Q.  Sure.

8    Have we now gone through all of the

9  extrinsic references that you have cited in

10  your declaration to support your interpretation

11  of the term "melting start temperature"?

12    A.  I lost the rest of my declaration.

13  It's here somewhere.

14    Q.  Do you want to take a minute and sort

15  it out?

16    A.  Here we go.  Okay.  To the other -- I'm

17  sorry.  You said extrinsic evidence?

18    Q.  Yes, sir.

19    A.  That's all the extrinsic evidence that

20  I have cited.

21    Q.  And that being the 1995 and the 2005

22  versions of the USP, right?

23    A.  Correct.

24    Q.  Now, let's take a look at the

1    specification itself of the '668.  I think

2    it's tab 4.

3         A.  I'm just trying to get myself in order.

4         Q.  Okay.

5         A.  Okay.  Tab 4?

6         Q.  I believe so.

7         A.  Okay.

8         Q.  And if we go to column 12.

9         A.  Yes.

10        Q.  And if we look at the line 4, it reads

11   "as used herein."

12              Do you see that?

13        A.  Yes.

14        Q.  "As used herein, the 'melting start

15   temperature' refers to the temperature at

16   which crystals start to melt when heated

17   under, for example, the DSC measurement

18   conditions to be mentioned below."

19              Do you see that?

20        A.  Yes.

21        Q.  And you rely on that language in your

22   declaration to support your definition of

23   "melting start temperature," correct?

24        A.  That's correct.

1    Q.  Now, the reference to the use of DSC is

2    illustrative in that sentence, correct?

3         MS. TAKAHASHI:  Objection.

4    Ambiguous.

5    A.  It says, "...when heated under, for

6    example, the DSC measurement conditions to be

7    mentioned below."  So that implies that other

8    methods could be used.

9    Q.  And so the inventors here are simply

10   giving one example of a method that could be

11   used, DSC, but they're not saying that other

12   methods should not be used, right?

13   A.  That's correct.

14   Q.  Now, in your definition of the term

15   "melting start temperature," you indicate or

16   your definition requires that DSC be used to

17   measure melting start temperature, correct?

18        Can you take a look at 86,

19   paragraph 86, 86C?

20   A.  Uh-huh.  Well, what I say is, in my

21   opinion, the phrase "melting start

22   temperature" means the temperature at which

23   crystals start to melt represented by the

24   onset temperature of melting as measured by

1    differential scanning calorimetry.

2        Q.  So your definition of "melting start

3    temperature" does not allow for the use of any

4    technique other than differential scanning

5    calorimetry to measure melting start

6    temperature, right?

7        A.  Correct.

8        Q.  And that's inconsistent with the

9    specification of the '668, correct?

10        A.  They use DSC as their example.

11        Q.  But they use it as an example, not as a

12    comprehensive list of all the techniques that

13    could be used?

14        A.  I would agree that it just says "for

15    example" in this place.  I'm not sure -- I

16    would have to look further to see if they have

17    other statements about DSC in here, but I

18    agree that there it says "for example."

19        Q.  Well, look and see if there's anywhere

20    else that you would like to point me to?

21        A.  Okay.  Well, in column 16, they, of

22    course have very specific information about

23    how they measured the melting start

24    temperature using a DSC under certain

1    as an example of one technique?

2        A.  We were -- I'm going back to our

3    earlier discussion about the "melting start

4    temperature" being ill-defined.  Well, it's

5    exactly defined in here.

6        Q.  And they say it can be measured by, for

7    example, DSC, right?

8        A.  That's what it --

9            MS. TAKAHASHI:  Objection.  Asked

10   and answered.

11       A.  Yeah.

12       Q.  And your definition requires the use of

13   DSC, correct?

14           MS. TAKAHASHI:  Objection.  Asked

15   and answered.

16       A.  As I previously said, that's correct.

17       Q.  Does -- in this specification, do the

18   inventors say at what point along the DSC

19   curve should be interpreted to be the melting

20   start temperature?

21       A.  They don't -- they don't indicate this,

22   but one of ordinary skill with a DSC knows

23   that all DSCs, even back in 1999, come with

24   software that will calculate melting start

1     temperature as well as peak melting

2     temperature, standard thermal analysis

3     technique.

4         Q.  Just so we're clear, nowhere in the

5     specification is it set out where along the

6     DSC curve should be determined to be the

7     melting start temperature, right?

8             MS. TAKAHASHI:  Objection.

9     Ambiguous.  Asked and answered.

10        A.  Well, it says -- it defines "melting

11    start temperature," the temperature at which

12    crystals start to melt when heated, for

13    example, the DSC measurement conditions, which

14    means that when -- which says using a DSC, is

15    when the heat flow curve starts to move

16    detectably off the baseline which is what DSC

17    software measures when it gives you a melting

18    start temperature.

19        Q.  And anywhere in your definition of

20    "melting start temperature," have you included

21    anything to indicate where it is along the DSC

22    curve that melting start temperature should be

23    defined?

24        A.  It's -- again, it's intrinsic in the

1    measurement device and the detector and the

2    software that's included.

3        Q.  And is it -- and you said a second ago

4    that it's -- it's the point at which there is

5    any measurable movement above the baseline?

6        A.  It --

7            MS. TAKAHASHI:  Objection.

8    Mischaracterizes the witness' testimony.

9        A.  Melting start temperature is clearly

10   when you start to see, in the case of melting,

11   an endotherm off the baseline, but you don't

12   visually detect it again.  You use software to

13   detect it.

14       Q.  So it's when there is an endotherm off

15   the baseline, that's the point that you would

16   peg as melting start temperature?

17       A.  It's not what I would peg.  It's how

18   it's defined.

19            I mean, it's how it's defined.  It's

20   actually in that USP section.  There was a --

21   we were just looking at it.  It defines it

22   exactly the same way.

23       Q.  So any endotherm off the baseline would

24   be the melting start temperature along a DSC

1    curve?

2         A.  No.

3              MS. TAKAHASHI:  Objection.

4    Mischaracterizes the witness' testimony.

5         A.  No.  When you have a full melting peak

6    and you want to know when the melting start

7    temperature is, okay, the DSC software would

8    detect when the melting began, okay, which is

9    when you're getting an endotherm off the

10   baseline.

11             But you would use the software to

12   detect it, and it would tell you where the

13   peak is, the place where you have the maximum

14   melting, and that would be considered the

15   melting point peak; and it would give you the

16   area under the curve, which is the enthalpy

17   change of melting.

18             That's how much heat you had to add

19   to do the melting.

20        Q.  Let's go to your declaration, and if

21   you can go to page 12.

22        A.  Right.

23        Q.  And you see paragraph 42, you have a

24   DSC curve?

1      A.  Yes.

2      Q.  And you've taken that from an article,

3  Exhibit 8, entitled "Differential Scanning

4  Calorimetry," the University of Southern

5  Mississippi Polymer Science Learning Center."

6           Do you see that?

7      A.  Correct.

8      Q.  In your opinion, where along that curve

9  would the melting start temperature be?

10           MS. TAKAHASHI:  Objection.

11  Ambiguous.

12      A.  Well, as I previously have said, at

13  least three times, eyeballing melting start

14  temperature is not particularly appropriate.

15           However, if you're asking me to

16  eyeball melting start temperature, you have a

17  baseline here that's, in this case, perfectly

18  horizontal and the curve is starting to move

19  off this baseline.  There's a standard

20  algorithm, which is included in the DSC

21  software, to analyze the baseline, which is

22  sometimes noisy, and the movement off the

23  baseline to tell you when you have a

24  statistically significant movement off the

1   baseline on the way up to this -- this peak.

2          So it's somewhere in this initial

3   region here, when they move off the baseline.

4   Again, I would not by eye give you an exact

5   place.

6      Q.  So for one of skill in the art in 1999

7   or 2000 would have to not only use DSC but

8   also use a software algorithm with DSC in

9   order to determine, in your opinion, melting

10  start temperature, correct?

11         MS. TAKAHASHI:  Objection.

12  Mischaracterizes the witness' testimony.

13     A.  That's what one of ordinary skill would

14  use because all DSCs in 1999 came with normal

15  analysis packages.

16         Now, you could -- in years before

17  that, we used to graphically analyze these

18  things, which is still possible, but I don't

19  think anybody in 1999 would be doing that.

20     Q.  Okay.  Let's take a look at --

21     A.  I think we're going to see one of my

22  papers.

23     Q.  We might see one of your papers.

24     A.  Yeah.  Yeah.  I bet I know which one:

1    the "Solubility Measurement Using [the] DSC."

2    That one?

3              MR. ACKER:  Well, let's take a look.

4    Let's mark this as -- it's going to be 14.

5              MR. DANE:  Don't give him any ideas.

6              THE COURT REPORTER:  Thirteen.

7         A.  I like that one.  That's a good paper.

8                   EXHIBIT 13 MARKED

9              MR. ACKER:  Thirteen?

10             THE COURT REPORTER:  It'll be 13.

11        A.  No.  Not one of mine.

12   BY MR. ACKER:

13        Q.  Feel free to look at any portion of the

14   article, Doctor, but I'm going to ask you

15   about figure 1.

16        A.  Okay.  I will start out with the fact

17   that I've never seen this article before.

18        Q.  Okay.  Fair enough.

19             If you take a look, it's an article

20   we've marked as Exhibit 13.  It's an article

21   by M.E. Brown entitled the "Determination of

22   Purity by Differential Scanning Calorimetry

23   (DSC)," and if you take a look at the second

24   page, down on the bottom right, you see

1 there's a volume number with the date of

2 May 5th, 1979.

3    Do you see that?

4 A. Uh-huh.

5 Q. You just have to answer yes or no.

6 A. Yes.

7 Q. And so this article, it would have been

8 in the art and available for one skilled in

9 the art looking at the '668 patent in 1999 or

10 2000, correct?

11 A. Yes.

12 Q. And if you take a look at the graph,

13 the DSC curve in figure 1, there's a spot

14 there, "$T_o$."

15    Do you see that?

16 A. Yes.

17 Q. And $T_o$ is defined in this article as

18 the melting point, correct?

19 A. I don't see that.

20 Q. If you take a look in the narrative

21 below figure 1.

22 A. Oh, okay.  I see.

23 Q. So in that line, $T_o$ is near the point

24 where the DSC curve comes off the baseline,

1    correct?

2         MS. TAKAHASHI:  Objection.

3    Ambiguous.

4    A.  I would define this as the melting

5    start temperature, myself.

6    Q.  Okay.  So, in your opinion, that point

7    $T_o$ in this article would be the melting start

8    temperature, although the authors here have

9    defined it as the melting point, correct?

10   A.  That's correct.  In some -- there's

11   some literature where people actually define

12   the melting start temperature as the melting

13   point as opposed to using the peak, which here

14   would be point B, as a melting point.

15        I think you can go to the literature

16   and find both definitions.

17   Q.  Okay.  So when you say the peak -- the

18   second line in figure 1 is labeled B at the

19   top?

20   A.  Right.

21   Q.  A is $T_o$, and that is defined in this

22   article as the melting point, right?

23   A.  Correct.

24   Q.  But the B line in this figure 1, which

1    is the peak of the DSC curve, you understand

2    that some folks in the art also label that as

3    the melting point?

4         MS. TAKAHASHI:  Objection.

5    Ambiguous.

6        A.  On occasion.  And most accurately, most

7    people report a melting point range which

8    would be A -- $T_o$ at A and C.

9        Q.  But you would agree with me that in the

10   1999 or 2000 time frame, there was no

11   consistency in the literature as to whether

12   the earlier point, the $T_o$, or point A in

13   figure 1, or the B, the height of the graph,

14   was labeled as melting point?

15        MS. TAKAHASHI:  Objection.  Vague.

16   Calls for speculation.

17       A.  I only know what I knew at that time,

18   which would be that in most analyses that I'm

19   familiar with, people would consider A a

20   melting onset, and they would use B as their

21   melting point; or more accurately, they'd

22   actually report the range.

23             And, in any case, if A is -- even if

24   you define A as melting point, it's only the

1   your declaration?

2       A.  Page --

3       Q.  I'm sorry.  Here.

4       A.  Page 5, yeah.  This one (indicating).

5       Q.  No.  At the bottom left, there's

6   numbers.

7       A.  Oh, okay.

8       Q.  And the graph at the top, is it the DSC

9   curve that you have in your declaration,

10  correct?

11      A.  Yes.

12      Q.  And it's labeled $T_m$, the height of the

13  DSC curve, correct?

14      A.  Right.

15      Q.  And the authors in this article that

16  you rely on refer to that as the melting

17  temperature, $T_m$, right?

18      A.  Correct.

19      Q.  So they don't call it the "melting

20  point," they call it the "melting

21  temperature," right?

22      A.  They do.

23      Q.  Let me show you another article.  We're

24  going to mark this as 14.

1              EXHIBIT 14 MARKED

2        A.  Yes.

3        Q.  Have you had a chance to look at that?

4        A.  Well, I've never seen it before, but

5    I've look at the title.

6        Q.  Okay.  This is an article by a Ronald

7    Amelia -- a D'Amelia, d'-A-M-E-L-I-A,

8    Department of Chemistry, Hofstra University,

9    and if we go down to the -- halfway down or

10   two-thirds of the way down the first column,

11   you see there's a reference to the use of DSC?

12       A.  Yes.

13       Q.  And then if you go to the right column

14   there, you see the paragraph that begins with

15   "All melting point data."

16       A.  Yes.

17       Q.  And it reads, "All melting point data

18   or endothermic transition temperatures are

19   obtained by taking the onset temperature of

20   the endothermic change from the thermal

21   baseline."

22              Do you see that?

23       A.  Yes.

24       Q.  There's no reference there of "melting

1    start temperature," correct?

2        A.  No.  But "onset temperature" and "start

3    temperature," again, are synonyms.

4        Q.  And in this article, they equate

5    melting point to the onset temperature of the

6    endothermic change, correct?

7        A.  Yes.

8        Q.  So if you take a look at the next page,

9    and if you go down to the graph, figure 1, on

10   the bottom left side.

11            Do you see that?

12       A.  Yes.

13       Q.  So instead of the melting point being

14   the height of the DSC graph in this article,

15   the melting point is actually where the DSC

16   curve begins to move off of the baseline,

17   right?

18       A.  They're defining that as their melting

19   point, correct.

20       Q.  And, again, there's no reference -- you

21   haven't had a chance to read the article, but

22   you don't see any reference in this article to

23   "melting start temperature," correct?

24            MS. TAKAHASHI:  Objection.  Vague.

1    A.  Again, they use the term "onset

2    temperature," which means the same thing.

3    Q.  And they actually point to the area

4    that you would call the "melting start

5    temperature," and they call it the "melting

6    point"?

7    A.  Right.  They also call it the "onset

8    temperature."

9    Q.  But don't use the term "melting start

10   temperature," we can agree on that?

11   A.  We can agree that they don't say --

12   they use a synonym for "start" as "onset."

13   Q.  And they also refer to that point as

14   the "melting point"?

15   A.  Right.

16   Q.  Let me show you another article.

17   Exhibit 15.

18                    EXHIBIT 15 MARKED

19   Q.  You might want to flip those over or

20   you're going to get -- they're going to get

21   lost in a sea of documents there.

22   A.  Uh-huh.

23   Q.  This is an article that you actually

24   relied on in reaching your opinions in this

1         If something becomes more pure, its

2    melting point goes up and, typically, the

3    melting point range, that is, the difference

4    between the onset temperature and the final

5    temperature declines.  The peaks become

6    sharper, although they don't show these

7    getting that much sharper.

8         I don't believe this indicates

9    anything about the -- what the melting points

10   are because -- I mean, what -- are they using

11   the peak or somewhere else on the curve?  It

12   just lists the purity for each of these three.

13      Q.  So looking at this graph, figure 5.4 in

14   the Byrn article you relied on, just looking

15   at the graph, you can't tell where along the

16   graph the Byrn authors decided was the melting

17   point of each of these substances?

18        MS. TAKAHASHI:  Objection.

19   Ambiguous.  Mischaracterizes the witness'

20   testimony.

21      A.  Well, what I would -- actually, it says

22   exactly what I would say here, which is -- I

23   just saw it a second ago.

24        Yeah.  It just says, in general, a

1      Q.  Yes, sir.

2      A.  Yes.

3      Q.  And if you go to the third paragraph

4   down that begins with "A limitation."

5           Do you see that?

6      A.  Yes.

7      Q.  That sentence reads -- or Dr. Brittain

8   wrote, "A limitation of DSC is that although

9   it reveals the existence of thermally induced

10  transitions, the nature of these transitions

11  can be difficult to determine."

12          Do you see that?

13     A.  Yes.

14     Q.  And you agree with that statement?

15     A.  Well, I mean, it can be.  It depends on

16  the sample and the situation.

17     Q.  You also reference a declaration by one

18  of the inventors in the case, a -- I believe

19  it's a doctor, but I'm not sure -- Urai,

20  U-R-A-I, correct?

21          You reference that declaration?

22     A.  I believe that's correct.

23     Q.  I think it's tab 21 of your materials.

24     A.  Yes.

1     Q.  And in that declaration, Tadashi,

2     T-A-d-A-S-H-I, Urai, U-R-A-I, makes a

3     declaration, and he is one of the inventors of

4     the '668 patent, correct?

5     A.  Yes.

6     Q.  And it looks like he is not a doctor,

7     but has a master's in engineering.

8              Do you see that?  He graduated

9     from --

10    A.  Oh, yeah.  I see that.  Yeah.

11    Q.  Okay.  And then, this is part of the

12    file history, this declaration is part of the

13    file history of the '668 patent, correct?

14    A.  Yes.

15    Q.  And that's the patent that in claims 9

16    or 10 contains this term "melting start

17    temperature" that we've been discussing,

18    right?

19    A.  Yes.

20    Q.  And in his declaration, Mr. Urai lays

21    out experiments that he conducted to determine

22    the -- what he calls the "melting start

23    temperature" of two samples in an earlier

24    patent, the '058 patent?

1          MS. TAKAHASHI:  Objection.

2     Misstates the document.

3          A.  Yes.  He reports on reference example 4

4     of the '058 and then crystal example 1 of the

5     '058 and example 2 of the '058.

6          Q.  And if you look at the declaration on

7     the right side, he says, under "method," he

8     writes, or he wrote, "The melting start

9     temperature was measured using DSC," and then

10    he lays out the conditions, correct?

11         A.  Correct.

12         Q.  And DSC is, again, the method that is

13    contained in your claim interpretation of

14    melting start temperature as the method that

15    should be used to determine melting start

16    temperature, right?

17         A.  Yes.  And also in the specification of

18    the patent.

19         Q.  And then he sets out the results that

20    he got for melting start temperature for

21    crystal example 1 of -- crystal example 1 of

22    the '058 patent and crystal example 2 of the

23    '058 patent, right?

24         A.  Correct.

1    Q.  And the melting start temperature he

2    got for crystal example 1 of the U.S. -- of

3    U.S. Patent '058 was 128.3 degrees Celsius,

4    right?

5    A.  That's what it says.

6    Q.  And if we go to the '058 patent which

7    is tab 1, okay?

8    A.  Tab 1.

9    Q.  And if you go to column 10.

10    A.  Column 10.

11    Q.  You see example 1 there?

12    A.  Correct.

13    Q.  And there's a melting point range

14    that's listed.

15         Do you see that, "MP"?

16    A.  Yes.

17    Q.  And it's a range of 144 to 144.5

18    degrees Celsius, right?

19         MS. TAKAHASHI:  Objection.

20    Misstates the document.

21    A.  Yes.  It does say -- give a melting

22    point range of 144.0 to 144.5.

23    Q.  So one of skill in the art reading the

24    '668 patent and its file history would see

1   that there's a reported melting point range of

2   144 to 144.5 degrees Celsius for example 1,

3   but there's also a reported melting start

4   temperature for that same example of 16 point

5   -- 16 degrees Celsius lower of 128.3, right?

6       A.  Where is the -- what number is the

7   declaration?  I'm sorry.

8       Q.  Twenty-one.

9       A.  They were also clearly different as

10  reported in this declaration as reported in

11  the '058 patent.

12      Q.  Okay.  When you say "this declaration,"

13  the melting start temperature for example 1 of

14  the '058 patent reported in the file history

15  of the '668 patent is not within the melting

16  range that is reported for that same crystal

17  in the '058 patent, right?

18          MS. TAKAHASHI:  Objection.

19  Ambiguous.  Misstates the documents.

20      A.  That's correct.  My understanding of

21  this, if we read the material, the resulting

22  crystals according to reference example at 4

23  is stored at 30 degrees in the chemical

24  development -- minus 30 degrees, chemical

1    development laboratory -- okay.  Same thing.

2              The resulting crystals according to

3    examples 1 and 2 of U.S. Patent No. 6,462,058

4    were provided, and, again, this is indicating

5    who gave it to him, and these crystals have

6    been stored at minus 30 degrees C in the Osaka

7    Research Center.

8              So these are crystals that were

9    prepared and saved.

10   Q.  And when Mr. Urai used DSC to obtain a

11   melting start temperature for example 1, the

12   crystal in example 1 of the '058 patent, he

13   got a reading of 128.3, which is 16 degrees

14   lower than the melting range reported in the

15   '058 patent for that same crystal?

16             MS. TAKAHASHI:  Objection.  Vague.

17   Misstates the document.

18   A.  That's correct.

19   Q.  And if we take a look at example -- the

20   reference to the melting start temperature for

21   example 2 of the '058 patent in Mr. Urai's

22   declaration, he used DSC and obtained a

23   melting start temperature of 129.1 degrees

24   Celsius, correct?

1    A.  That's correct.

2    Q.  And if we go to the '058 patent and

3    look at example 2 in column 11, you see

4    there's a melting point range there of 147 to

5    148 degrees Celsius.

6    A.  Yes.

7    Q.  So one of skill in the art reading the

8    '668 patent and its file history would find

9    that for example 2 of the '058 patent, the

10   melting start temperature is 129.1 degrees,

11   and the melting point is a range of 147 to 148

12   degrees, right?

13   A.  Well, they would see the -- they would

14   see that the difference between these reported

15   melting points, the melting point range in the

16   patent was substantially different than the

17   melting start temperature reported in the

18   declaration.

19   Q.  And the melting start temperature that

20   was determined by the method that you believe

21   should be the method used to determine melting

22   start temperature, correct?

23   A.  Using the DSC.

24   Q.  And when DSC was used to analyze the

1   melting start temperature of example 1 and

2   example 2 of the '058 patent, melting start

3   temperatures were obtained that were 16 and

4   17 degrees lower than the melting point range

5   reported in the '058 patent?

6          MS. TAKAHASHI:  Objection.

7   Misstates the document.

8      A.  Different values were obtained in the

9   declaration than those reported in the patent.

10  That's correct.

11     Q.  And this information, that is, the Urai

12  declaration, would be a part of the file

13  history that one of skill in the art would

14  look to when trying to understand what the

15  term "melting start temperature" meant in the

16  '668 patent, correct?

17     A.  I assume they could.  Though, as I

18  previously testified, I think one of ordinary

19  skill would understand what the term means

20  from the patent and the specification.

21     Q.  Let me ask you about the term "about."

22          The term "about" was another term

23  that you were asked to provide an opinion

24  about it's meaning as part of your work in

1    Q. Claim 10 reads, "The crystal of claim 9
2    wherein the melting start temperature is about
3    135 degrees Celsius."
4            Do you see that?
5    A. Yes.
6    Q. And your definition of "about" is
7    "approximately." So, in your opinion, can you
8    place a -- quantitatively place a number of
9    degrees on what "approximately 135 degrees
10   Celsius" means?
11   A. Well, in the context of my previous
12   claim construction about melting start
13   temperature being measured with a DSC, okay,
14   and based on one of ordinary skill in the art
15   understanding of how a DSC would work, it
16   would be probably on the order of about .2,
17   .3 degrees C, maximum.
18   Q. Each way, up and down?
19   A. Plus or minus, yeah.
20   Q. So if --
21   A. I'm sorry. Let me modify my answer to
22   say for repeating identical samples at
23   identical conditions.
24   Q. Okay. So let me ask it this way.

1          If there was a compound that was a

2  crystal that met the limitations of claim 9

3  and it had a melting start temperature of

4  135.5, do you believe it would fall within the

5  meets and bounds of claim 10?

6          MS. TAKAHASHI:  Objection.

7  Ambiguous.

8     A.  So the question is, would 135.5 meet

9  claim 10?

10     Q.  No.  Let me -- I think you just said

11  that in your opinion, "approximately" would

12  allow you to go above or below 135 by .2

13  degrees Celsius.

14     A.  Correct.

15     Q.  So --

16     A.  I said .2 or .3, actually, but.

17     Q.  .2 or .3?

18     A.  Uh-huh.

19     Q.  So -- and that's the full extent of

20  "approximately" that you would -- as one of

21  skill in the art would put on it?  That

22  "approximately" would extend claim 10 up to

23  135.3 and down to 134.7 degrees Celsius?

24     A.  Correct.

1     Q.  And if a compound had a melting start

2  temperature that was greater than 135.3 degrees

3  Celsius, then it wouldn't fall within the

4  scope of claim 10 under your definition?

5     A.  That's correct.

6     Q.  And similarly, if a compound that met

7  the limitations of claim 9 had a melting start

8  temperature of 134.6, it would not meet the

9  limitations of claim 10?

10     A.  No.  That's not correct.

11     Q.  What have I got wrong about that?

12     A.  Because claim 10 says a melting start

13  temperature of not lower than 131 point C.  It

14  has no upper range.

15     Q.  No.  It says, is "about" 135 degrees

16  Celsius.

17     A.  Not lower than about 131 degrees C.  So

18  you can be anything above 131 C.

19     Q.  Yeah.  I'm looking at claim 10, not 9.

20     A.  You actually just said "9."

21     Q.  Well, let me start over then.

22          When I said "9," it's a dependent

23  claim, claim 10.  So you have to satisfy all

24  the claim limitations of claim 9.

1    A F T E R N O O N   S E S S I O N

2              EXHIBITS 16 AND 17 MARKED

3              THE VIDEOGRAPHER:  Back on the

4    record, 1:23 p.m.

5       BY MR. ACKER:

6       Q.  Good afternoon, Doctor.

7       A.  Good afternoon.

8       Q.  Let me hand you what we've marked as

9    Exhibit 16.

10              MS. TAKAHASHI:  Thank you.

11       Q.  Then I'm going to hand you another

12    document, what we've marked as Exhibit 17,

13    Doctor.

14              Exhibit 16 is a document we marked

15    that's entitled "Plaintiffs' Responses to

16    Anchen Pharmaceutical Inc.'s First Set of

17    Interrogatories," and I want to direct your

18    attention to, if I might, Interrogatory No. 2

19    on page 4; and this is a document in which

20    Anchen is asking Takeda to respond to the

21    following question:  "Identify all facts

22    supporting Takeda's assertion that Takeda's

23    Dexilant product, which is the subject of New

24    Drug Application (NDA) 22-287, is covered by

1  the asserted claims of the listed patents

2  identified in Takeda's disclosure of asserted

3  claims and infringement contentions, including

4  but not limited to, any dissolution tests, XRP

5  [sic] analyses, studies, research, and

6  literature."

7         And if you go down to the response

8  to that question, if you go down to lines 24

9  and 25, you see there's a reference to

10  claims 9 and 10 of the '688 patent.

11         Do you see that, Doctor?

12  A.  Uh-huh.

13  Q.  You have to answer yes or no.

14  A.  Yes.

15  Q.  Okay.  And then if you go to the next

16  page, page 5, lines 1 and 2, Takeda is

17  responding to that interrogatory saying "NDA

18  No. 22-287 (hereinafter the Dexilant NDA)

19  generally contains facts and analyses that

20  demonstrate that Takeda's Dexilant product

21  satisfied the claims listed above."

22         And then if you go over to page 6,

23  at lines 6 through 9, you see Takeda responds

24  "SSCI also measured a melting start temperature

1    of 140 degrees Celsius for the dexlansoprazole

2    drug substance by hot stage microscopy,

3    demonstrating that the Dexilant product meets

4    the limitations of claim 9 and 10 of the '668

5    patent."  And you see there's a reference

6    there to a certain document.

7            Do you see that, Doctor?

8        A.  Yes.

9        Q.  And then if you take look at exhibit

10   seven -- the other document I handed you,

11   Exhibit 17.

12       A.  Yes.

13       Q.  You see that Exhibit 17 is entitled

14   "Executive Summary."

15           Do you have that?

16       A.  Uh-huh.  Seventeen, yes.

17       Q.  "Executive Summary of TAK-390 Solid

18   State Chemistry," and you see in the title, it

19   says, "A report generated for Takeda

20   Pharmaceutical, Limited, on 12/28/2007."

21           Do you see that?

22       A.  Yes.

23       Q.  And if you go into the document, under

24   the summary, under the first page --

1    A.  Yes.

2    Q.  -- the first paragraph reads, "This

3    document summarizes multiple studies performed

4    at SSCI, Inc., including a polymorph screen

5    preparation/characterization/physical

6    stability of solid forms [2,3], computational

7    study of the solid forms [4],

8    solubility/chemical study of solid forms [5],

9    and method development of an XRP [sic] limited

10   test for impurity forms B, C, d, and F in

11   TAK-390MR Granules-h [6]."

12            Do you see that?

13   A.  Yes.

14   Q.  And then if you go down to the third

15   paragraph, it reads in the first sentence

16   there, "In summary, form A is the anhydrous

17   form and is the final form of choice."

18            Do you see that?

19   A.  "Anhydrous"?

20   Q.  "Anhydrous," yes.  Do you see that?

21   A.  Yes.

22   Q.  Okay.  And then if we go to page 6 of

23   19, do you see the B up there?  It says

24   "form A."

1     A. Yes.

2     Q. It says, "Form A is anhydrous

3  non-hygroscopic crystalline material which

4  melts at 140 degrees Celsius."

5     A. It actually says 148 degrees.

6     Q. I'm sorry. "148 degrees Celsius."

7        Do you see that?

8     A. Yes.

9     Q. And then if you go down to the chart

10  below, you see that the melting point of

11  148 degrees Celsius, that was determined by

12  DSC.

13        Do you see that?

14     A. Yeah. There's one DSC, 10 degrees C,

15  data of a major endotherm, 148 degrees C.

16     Q. But if you go down lower, you see

17  there's a reference to something called "HSM."

18        Do you see that test?

19     A. Yes.

20     Q. And if you go back to the page before,

21  you see there's an abbreviation there for HSM

22  of hot stage microscopy?

23     A. Yes.

24     Q. And what is hot stage microscopy?

1      A.  Hot stage microscopy is a technique

2   where you have a stage on a microscope that --

3   generally, they're programmable stages where

4   you can put a microscope slide that's sealed

5   or unsealed, as you wish, and you can increase

6   the temperature in a desired way, or you can

7   hold the temperature, and you can observe

8   through the microscope the crystal while it's

9   being heated.

10     Q.  So this is another method unlike --

11   it's different than DSC to determine a melting

12   point of a solid?

13     A.  Right.  It's closer -- it's closer in a

14   sense to the capillary method because you're

15   using visual observation as your means of

16   determining whether -- when something starts

17   to melt and when it's completely melted.

18           But, yes, it's another method.

19     Q.  If you go back to the page with the

20   actual data on it for the crystalline

21   material, you see under the HSM study, it

22   says, "Melt onset at 140 degree Celsius.  Melt

23   completed by 145 degrees Celsius."

24           Do you see that?

1    A.  Yes, I do.

2    Q.  Now, if we go back to the interrogatory,

3    Exhibit 16, and you go to page 6, in lines 6

4    through 9, Takeda indicated in response to

5    Anchen's interrogatory question, "SSCI also

6    measured a melting start temperature of 140

7    degrees Celsius for the dexlansoprazole drug

8    substance by hot stage microscopy,

9    demonstrating that the Dexilant product meets

10   the limitations of claims 9 and 10 of the '668

11   patent."

12            Do you see that?

13   A.  Yes.

14   Q.  So when Takeda is measuring its

15   Dexilant product to determine whether or not

16   it falls within the claims of claims 9 and 10

17   of the '668 patent and that whether it meets

18   the melting start temperature, it's not using

19   DSC, but it's using HSM to conduct that

20   measurement, correct?

21            MS. TAKAHASHI:  Objection.  Calls

22   for a legal conclusion.  Mischaracterizes the

23   documents, and this witness hasn't seen these

24   documents before today.

1    A.  What's referenced in this Exhibit 16

2    certainly has to do with hot stage microscopy.

3    What's been measured in the report

4    -- I'm sure if I look at the full report,

5    there might be more information -- is both DSC

6    and hot stage microscopy for measuring a

7    melting start temperature and melting point.

8    Q.  Okay.  If we look at page 6 of 10 of

9    the report, for form A, HSM was used to

10   determine a melt onset at 140 degrees Celsius.

11   Do you see that?

12   A.  It's reported as a melt onset and a

13   melt completed.  That's correct.

14   Q.  And under your interpretation of melt

15   start temperature of claims 9 and 10 in the

16   '668 patent, that would not be the proper

17   technique to use to determine a melt start

18   temperature, right?

19   A.  As I previously testified, I would

20   think that a DSC would be proper, and they

21   have this data available.

22   They don't report it in this table,

23   but they report a DSC measurement, and they

24   only report the major endotherm, but the DSC

1    trace is part of this report somewhere, or in

2    the appendix, which would allow one to get a

3    melting start temperature from this, as well.

4        Q.  But what they relied on in the

5    interrogatory response to say that they --

6    that their Dexilant product fell within

7    claims 9 and 10 of the '668 patent was the

8    140 degree Celsius melt start temperature

9    determined using HSM, correct?

10            MS. TAKAHASHI:  Objection.  Calls

11   for a legal conclusion.

12       A.  All I can tell you is that's what they

13   wrote in this interrogatory.  I have no other

14   knowledge of why they used that as opposed to

15   something else.

16       Q.  And in your opinion as a scientist, do

17   you think that using a melting start

18   temperature determined by HSM is the proper

19   way to determine whether or not a compound

20   falls within the claims of 9 and 10 of the

21   '668 patent?

22            MS. TAKAHASHI:  Objection.  Vague

23   and ambiguous.  Calls for a legal conclusion.

24       A.  As I previously testified and wrote in

1    my expert report, I think the proper way to do

2    this is through DSC.

3        Q.  So a melting start temperature obtained

4    using HSM would not be the proper way to

5    determine whether or not a product fell under

6    claims 9 and 10 of the '668 patent, right?

7        A.  Well, not according to my

8    interpretation of the proper claim

9    construction.

10       Q.  Now, so if Takeda is relying on a

11   melting start temperature obtained by using

12   HSM to claim that its Dexilant product falls

13   within claims 9 and 10 of the '668 patent, in

14   your opinion, that's an improper analysis?

15       A.  I have no --

16           MS. TAKAHASHI:  Objection.  Calls

17   for a legal conclusion.

18           You can answer.

19           THE WITNESS:  Sorry.

20       A.  I have no opinion of what's on Takeda's

21   mind.  I mean, I previously testified that I

22   think the proper claim construction involves

23   using a DSC, and that's just my answer to the

24   question.

1    disputed term 'amorphous compound' to mean 'a

2    noncrystalline solid that lacks the long-range

3    order characteristic of a crystal.'"

4                Did I read that correctly?

5    A.  Yes.

6    Q.  And that is your opinion?

7    A.  Yes.

8    Q.  Back in paragraph 52 of your

9    declaration --

10   A.  Yes.

11   Q.  -- you also stated that, "I further

12   understand that unless a patentee defines a

13   term differently in the patent specification,

14   either expressly or by clear implication, a

15   claim term generally should be afforded its

16   ordinary and customary meaning as it would be

17   understood by a person of ordinary skill in

18   the art taking into the account the language

19   of the claims themselves and the teachings of

20   the specification."

21                Did I read that correctly?

22   A.  Yes, you did.

23   Q.  Is it correct that the term "amorphous

24   compound" in claims 1 and 2 of the '282 patent

1     is not expressly defined in the specification?

2         A.  I don't believe there is a definition

3     expressly in the specification.

4         Q.  Is it true that the specification does

5     not even use the term "amorphous compound"?

6         A.  I would have to look.  I don't recall.

7         Q.  Turning back to paragraph 80 in your

8     definition -- or your -- excuse me, your

9     construction of amorphous compound.

10        A.  Yes.

11        Q.  Do I understand your construction

12    correctly to mean that amorphous compound,

13    basically, means a noncrystalline solid?

14        A.  As used in this -- in the '282 patent,

15    that's correct.

16        Q.  In general, is it your opinion that

17    the word "compound" and the word "solid" are

18    synonymous?

19             MS. TAKAHASHI:  Objection.  Vague.

20        A.  Compound and?

21        Q.  Solid.

22        A.  No.  Not necessarily.

23        Q.  And why is that?

24        A.  There are compounds that are liquid,

1    solids, or gases.

2       Q.  So it's correct that a compound can be

3    a nonsolid?

4       A.  That's correct.

5       Q.  Am I also correct that a noncrystalline

6    can be a nonsolid?

7       A.  I'm sorry.  Could you repeat that?

8       Q.  Am I also correct that a noncrystalline

9    could be a nonsolid?

10          MS. TAKAHASHI:  Objection.

11   Ambiguous.

12      A.  Okay.  When -- typically, the term

13   "noncrystalline" is used to describe

14   crystalline or noncrystalline solids; but,

15   clearly, a liquid or a gas are not crystalline

16   either, I mean, but that's not a normal usage.

17          When you say something -- referring

18   to crystallinity, you're referring to the

19   solid state, generally.

20      Q.  And so it is understood that

21   noncrystalline is essentially a nonsolid?

22          MS. TAKAHASHI:  Objection.

23   Mischaracterizes the witness' testimony.

24      A.  No.  That's not what I said at all.

1    is noncrystalline because that's obvious.

2    Everyone knows that.

3        Q.  Am I correct that there is no express

4    definition in the '282 specification that

5    limits amorphous compound to a solid compound?

6            MS. TAKAHASHI:  Objection.  Asked

7    and answered.

8        A.  There's nothing in the '282 patent

9    except the claim and the examples in the

10   specification where they prepare what they

11   call amorphous material.

12       Q.  So it's correct that there's no express

13   definition in the specification limiting

14   amorphous compound to a solid compound?

15           MS. TAKAHASHI:  Objection.  Asked

16   and answered.

17       A.  No.  There's no definition of amorphous

18   at all in the '282 patent.

19       Q.  And it's also correct that there's no

20   express disavow of amorphous nonsolids in the

21   specification, correct?

22           MS. TAKAHASHI:  Objection.  Vague.

23       A.  There's no discussion at all about

24   amorphous nonsolids.

1    Q.  So am I correct that a person of

2    ordinary skill in the art in 1999 would

3    understand that an amorphous compound, as it's

4    claimed in claims 1 and 2 of the '282 patent,

5    could be referring to an amorphous solid or a

6    nonsolid?

7    A.  I don't believe so in interpreting that

8    claim in light of the specification and the

9    examples and their knowledge.  I think they

10   would look at the examples that prepare the

11   amorphous material and realize it's amorphous

12   solid.

13   Q.  But according to the plain and ordinary

14   meaning of the term "amorphous compound," a

15   person of ordinary skill in the art would

16   understand that that could be referring to a

17   solid or a nonsolid compound, correct?

18   A.  If one interpreted "amorphous compound"

19   without reference to the specification at all,

20   okay, in a vacuum, that's correct.  But one of

21   ordinary skill would read the specification

22   and interpret the term in light of the

23   specification.

24   Q.  Looking at paragraph 81 of your

1  fact, I would assume that the same material

2  would be in earlier editions, which I don't

3  think I was able to find.  So earlier editions

4  of this would have been available.

5          We quoted my Second Edition in 2001,

6  but I believe in my First Edition, I have the

7  same definition, which would be 1991, but I

8  don't remember that for a fact, and...

9          Yeah, again, these are -- reference

10  Exhibit 27 is a Fourth Edition.  So I'm

11  assuming there is an edition prior to 1999

12  with the same definition.

13          Reference 14 would not have been

14  available.  That's a relative new book.

15      Q.  Strictly speaking, as the references

16  are identified here, only Exhibits 10 and 11,

17  based on their date, would be available to

18  persons of ordinary skill in 1999, correct?

19      A.  That's correct.

20      Q.  And these references that you have

21  identified here support the understanding of

22  what an amorphous solid is, correct?

23      A.  That's correct.

24      Q.  But the claim term at issue is

1  "amorphous compound," correct?

2      A.  That's the claim term.

3      Q.  And am I correct that the none of the

4  references you've listed define the exact

5  declaim term "amorphous compound"?

6      A.  No.  They all use either "amorphous

7  material" or "amorphous solid."

8      Q.  Is it correct that the '282 patent

9  specification does not use the term "amorphous

10  solid"?

11          MS. TAKAHASHI:  Objection.  Asked

12  and answered.

13      A.  No.  I believe in the claim, as we're

14  discussing, it uses "amorphous compound," and

15  in the specification and the examples, it just

16  says "amorphous."

17      Q.  Do you understand the reference in the

18  '282 patent specification to be to "amorphous

19  substance"?

20      A.  I would have to look at the

21  specification.

22      Q.  Okay.  Let's turn to the '282 patent.

23  I believe that's Exhibit 5 to your declaration.

24  And I believe you reference a couple of

          1          MS. TAKAHASHI:  Objection.
          2    Ambiguous.
          3       A.  Well, it's my opinion that these two
          4    examples, they're amorphous substances
          5    described in an amorphous solid.  So I think
          6    they -- the amorphous compound and the
          7    amorphous substance, in both cases, is an
          8    amorphous solid.
          9       Q.  I understand that that's your stated
         10    construction, but would you agree with me that
         11    whatever "amorphous compound" means in the
         12    claims, it must mean something that's as broad
         13    as the term "amorphous substance" used in
         14    these reference examples?
         15          MS. TAKAHASHI:  Objection.
         16    Ambiguous.
         17       A.  It should mean the same thing, in my
         18    opinion.
         19       Q.  Okay.  Would it mean something more
         20    broad than the term "amorphous substance" used
         21    in these examples?
         22       A.  No.  I think it should mean -- it means
         23    the identical thing.
         24          MS. TAKAHASHI:  Objection.

1    solids?

2    A.  This definition is certainly not

3    limited to solids.

4    Q.  Am I correct that a person of ordinary

5    skill in the art in 1999 would know that the

6    term "amorphous substance" was not limited to

7    solids?

8          MS. TAKAHASHI:  Objection.

9    Ambiguous.

10    A.  The -- one of ordinary skill would

11    understand, in a vacuum by itself, the term

12    "amorphous substance" could include liquids,

13    vapors, or solids.

14          However, one of ordinary skill

15    interpreting the statement of amorphous

16    substance in the '282 patent, in these

17    examples, would understand them to be meaning

18    an amorphous solid.

19    Q.  Is the basis for your position that

20    you just stated reflected in paragraph 83 of

21    your declaration?

22    A.  Yes.

23    Q.  Can you explain for me the basis for

24    your statements in paragraph 83?

1    A.  If one evaporates to an oil, okay, it

2  usually means that the evaporation isn't

3  necessarily complete because an oil still has

4  a vapor pressure.  So they usually say they

5  evaporated, and the result was an oil.

6           You always specify when you have an

7  oil because you could keep evaporating, you

8  could keep heating forever and distill the

9  whole material off if that was the case.

10          So when you say "evaporate to

11  dryness," you mean a solid, as described here.

12   Q.  If you've evaporated to an oil, is it

13  correct that all you would simply need to do

14  would be evaporate further to achieve the

15  solid that's disclosed in the '282 patent?

16   A.  No.  Not if the oil was a true liquid.

17  You could just keep evaporating it forever

18  until you had nothing left.

19   Q.  What do you mean by "true liquid"?

20   A.  An oil is a liquid, right?  It's just a

21  viscous liquid, right?

22           If there is no solid -- there is --

23  if the condition you're working with, no

24  potential for making a solid, you can distill

1    your opinion that evaporation in reference

2    examples 1 and 2 of the '282 patent would not

3    also, at least possibly, afford an oil,

4    correct?

5              MS. TAKAHASHI:  Objection.

6    Ambiguous.  Lacks foundation.

7         A.  As I say, they would have said "oil" if

8    they meant oil.

9         Q.  And is that your only basis for

10   concluding that reference examples 1 and 2 of

11   the '282 patent result in solids?

12             MS. TAKAHASHI:  Objection.  Asked

13   and answered.

14        A.  Yeah.  I think I've testified to this a

15   number of times.

16             They -- if somebody produces an oil

17   in an example, they say an oil.  If they

18   produce an amorphous solid, they would

19   normally say an amorphous -- in this case, let

20   me make sure I get the language correct --

21   amorphous substance.

22        Q.  But they didn't say "amorphous solid,"

23   correct?

24        A.  No.  But, again, it's my interpretation

1     A.  Yes.

2     Q.  Claim 9.

3        Okay.  It references a crystal of

4  dexlansoprazole having a melting start

5  temperature of not lower than 131 C?

6        Do you see that?

7     A.  Yes.

8     Q.  Okay.  Now, how would you go about

9  getting at sample of a crystal of

10  dexlansoprazole to subject to this test?

11     A.  Oh, I would not interpret that to mean

12  a single crystal.  It means crystalline

13  dexlansoprazole.

14        So you normally would not find a

15  single crystal to do a DSC on.  You would take

16  a sample of a known mass, which would have

17  multiple crystals.

18     Q.  Okay.  And so you would -- you would --

19  so explain to me how would you then obtain the

20  sample of the dexlansoprazole material for DSC

21  testing as you've defined it in your claim

22  construction?

23        MS. TAKAHASHI:  Objection.  Vague.

24     A.  You -- well, I mean, if we were doing

1    molecules with long-range order and three

2    dimensions"; is that correct?

3       A.  Yes.

4       Q.  Okay.  By -- are you intending to limit

5    the meaning of the word "crystal" by using

6    this definition?

7            MS. TAKAHASHI:  Objection.

8    Ambiguous.

9       A.  I guess I'm not sure what you mean by

10   "limit"?

11            It's the definition of what a

12   crystal is, and in reference to this patent,

13   we're dealing with molecules.  So it's a

14   molecular crystal.

15      Q.  So you think the scope and the meaning

16   of "crystal" is equivalent to the scope and

17   meaning of the phrase you've chosen,

18   "regularly repeating pattern of molecules

19   with long-range order and three dimensions";

20   is that correct?

21            MS. TAKAHASHI:  Objection.

22   Ambiguous.  Mischaracterizes the witness'

23   testimony.

24      A.  I'm sorry.  Could you repeat that one

1    you to determine that something is crystalline,

2    but the -- but those are generally the ways

3    you would determine if something's a crystal

4    or not.

5        Q.  And what does "long-range order" mean?

6        A.  It means that this repeating pattern

7    continues in exactly the same way for lots of

8    molecules.

9        Q.  How much?

10       A.  Certainly, it would have to be the

11   number of molecules equal to the minimum size

12   crystal you can get of something, which in the

13   case of these organic molecular materials

14   would be on the order of a couple of microns,

15   a micron, two microns, and that's still a lot

16   of molecules.

17           I have to calculate how many, but

18   it's many.

19       Q.  And in your proposed construction, what

20   does "three dimensions" mean?

21       A.  It means the normal usage of three

22   dimensions, three spatial dimensions.

23       Q.  Now, why is your proposed construction,

24   or if it is, why is your proposed construction

1    regularly repeating pattern, et cetera, more

2    helpful than just simply the word "crystal" or

3    "crystalline compound"?

4              MS. TAKAHASHI:  Objection.  Calls

5    for a legal conclusion.

6         A.  I don't know.  The -- my definition is

7    what a crystal is.  So I guess I'm not sure I

8    know why.

9              I mean, that is what a crystal is.

10   So it's a description of what a crystal is.

11        Q.  Now, if we look at -- I think we still

12   have '058 patent.  If we go back, I think, to

13   example 10 -- or example 1 on column 10.

14        A.  I'm sorry.  The '058?

15        Q.  '058, yes.

16             MS. TAKAHASHI:  That's the right

17   one.

18             THE WITNESS:  This is it?

19             MS. TAKAHASHI:  Yeah.

20             THE WITNESS:  Okay.  I got it.

21        Q.  It's Exhibit 1 to your declaration.

22        A.  Okay.

23             THE WITNESS:  Column 10?

24             MS. TAKAHASHI:  Yeah.

1      Q.  Column 10.

2      A.  Okay.

3      Q.  I think we talked a little bit about

4  example 1 where we said "after a crystal began

5  to form."

6      A.  Yes.

7      Q.  Would it be appropriate to simply say

8  after a repeating -- regularly repeating

9  pattern of molecules with long-range order and

10  three dimensions began to form, diethyl ether

11  was added and the container was stoppered and

12  kept standing at room temperature?

13      A.  If you wanted to be very wordy.  I

14  mean, it means the same thing.

15      Q.  So what the inventor, or someone,

16  observed in example 1 that they called a

17  crystal, you're saying it would've -- the same

18  thing would be they observed a regularly

19  repeating pattern of molecules with long-range

20  order in three dimensions?

21          That's what they meant?

22          MS. TAKAHASHI:  Objection.  Calls

23  for a legal conclusion.  Asked and answered.

24      A.  That is the definition of a crystal.

1    Q.  Well --

2    A.  So what I am saying is, if you -- if

3    you substitute the definition of a crystal for

4    the word "crystal," you end up saying exactly

5    the same thing.

6    Q.  Well isn't -- isn't regularly repeating

7    pattern of molecules with long-range order and

8    three dimensions a characteristic of a

9    crystal?

10    A.  That's exactly what a crystal is.

11    Q.  Well, let's turn to your definition of

12    "amorphous compound."

13         You say that an amorphous compound

14    as used in the '282 patent, it means "a

15    noncrystalline solid that lacks the long-range

16    order characteristic of a crystal."

17    A.  That's correct.

18    Q.  So isn't it fair to say that this

19    long-range order that you're talking about is

20    a characteristic of a crystal?

21         MS. TAKAHASHI:  Objection.

22    Argumentative.  Calls for a legal conclusion.

23    A.  It's the definition of a crystal.  If

24    you don't have the long-range order, it's not

1  a crystal.

2     Q.  So did I mean your -- did I misread

3  your -- then why did you choose the word

4  "characteristic" when you -- when you offered

5  a definition for "amorphous compound," why did

6  you call the long-range order a "characteristic

7  of a crystal"?

8          MS. TAKAHASHI:  Objection.

9  Ambiguous.  Argumentative.

10    A.  Well, it is a characteristic of a

11  crystal because it is the definition of a

12  crystal.

13    Q.  Thank you.

14          I'm trying to avoid going over

15  things that you've already addressed.  So I

16  apologize for that.

17          MS. TAKAHASHI:  Take your time, Don.

18    Q.  In your definition of "amorphous," you

19  state -- the definition you chose was "a

20  noncrystalline solid that lacks the long-range

21  order characteristic of a crystal."

22    A.  Yes.

23    Q.  Why didn't you say "a noncrystalline

24  solid that lacks the long-range order

1    characteristic of a regularly repeating

2    pattern of molecules with long-range order in

3    three dimensions"?

4        A.  That's redundant because I'm already

5    referring to the long-range order.  I mean,

6    those are synonyms of what a crystal is.

7        Q.  Why didn't you say "a nonregularly

8    repeating pattern of molecules with long-range

9    order and three dimensions that lacks the

10   long-range order characteristic of a regularly

11   repeating pattern of molecules with long-range

12   order in three dimensions"?

13       A.  Because that's a horribly -- that's a

14   horrible sentence, number one; and, number

15   two, it's saying the exact same thing twice,

16   okay.

17            So in a sense, you could say

18   crystals are shorthand for the long-range

19   three-dimensional order.  So -- and that's

20   what I'm describing.

21       Q.  Prior to 2000, did the phrase

22   "amorphous solid" exist?

23       A.  Yes.

24       Q.  Okay.  So if the inventors wanted to

1    refer to an amorphous solid, they could have

2    -- they would have been familiar with the term

3    "amorphous solid," correct?

4          MS. TAKAHASHI:  Objection.  Assumes

5    facts not in evidence.

6    A.  The term "amorphous solid" existed.

7    That's correct.

8    Q.  On page 23 of your declaration, which

9    is Exhibit 12 --

10    A.  Page 23?

11    Q.  I'm sorry.  Paragraph 23.

12    A.  Paragraph 23.

13    Q.  Strike that.  You've already answered

14    that.

15          Let's go to paragraph 57 of your

16    declaration.

17    A.  Yes.

18    Q.  I think -- you have a number of

19    exhibits that you think support your

20    definition of the term "crystal," and they're

21    listed in the table that begins on page 15; is

22    that correct?

23    A.  Yes.

24    Q.  Okay.  And I assume that the -- the far

1    CERTIFICATE

2    COMMONWEALTH OF MASSACHUSETTS )

3    COUNTY OF SUFFOLK           )

4

5          I, Deborah Roth, a Registered

6    Professional Reporter and Notary Public duly

7    commissioned and qualified in and for the

8    Commonwealth of Massachusetts, do hereby

9    certify: That Allan Myerson, Ph.D., the

10    witness whose deposition is hereinbefore set

11    forth, was duly identified and sworn by me,

12    and that the foregoing transcript is a true

13    record of the testimony given by such witness

14    to the best of my ability.

15          I further certify that I am not

16    related to any of the parties in this matter

17    by blood or marriage, and that I am in no way

18    interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have

20    hereunto set my hand and affixed my notarial

21    seal this 17th day of November 2011.

22    *Deborah Roth*

23    Deborah Roth, CSR: 14700-S, RPR: 34250

24    My Commission Expires:  January 23, 2015